| | | |
|---|---|---|
| JANE DOE and JOHN DOE, as | ) | |
| Guardians and Parents and Next Friends of | ) | |
| JAMES DOE, a Disabled Person, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 19 C 00263 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO; HILARIO VELARDE; | ) | |
| and DARIUS REYNOLDS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The parents of a disabled student at Ray Graham Training Center High School in Chicago have brought this lawsuit on their son's behalf.[1] *See* R. 19,[2] Am. Compl. ¶¶ 5-7, 15-16. The Plaintiffs allege that a school employee sexually abused their son, and they bring several federal and state law claims against the Chicago Board of Education, as well as school employees Hilario Velarde and Darius Reynolds.[3]

Specifically, the Plaintiffs claim that the Board discriminated against the student (who is going by "James Doe" on the public docket) in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Count 1); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count 2); and Title II of the Americans

---

[1]The Court has federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

[2]Citations to the record are noted as "R." followed by the docket number.

[3]In light of the sexual-abuse allegations, the parents and the student are all proceeding on the public docket using Doe monikers. The motion to do so, R. 20, is granted. *See Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1297 (7th Cir. 1995).

with Disabilities Act (ADA), 42 U.S.C. § 12132 (Count 3). Against the alleged abuser (Velarde), the Plaintiffs bring equal protection (Count 4), Fourth Amendment (Count 5), and substantive due process (Count 6) claims. Against Reynolds, who was a special-education assistant, the Plaintiffs bring a failure-to-intervene claim (Count 10). In addition to the federal claims, the Plaintiffs bring state-law claims for negligence (Count 7) and willful and wanton conduct (Count 8) against the Board, as well as a battery claim against both the Board and Velarde (Count 9).

The Defendants now seek to dismiss the Amended Complaint for failure to adequately state a claim. Fed. R. Civ. P. 12(b)(6). *See generally* R. 24; R. 27; R. 37. For the reasons discussed below, the Board's and Velarde's motions are denied in part and granted in part, and Reynolds' motion is denied.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). James Doe is an adult but was a student at Chicago's Ray Graham Training Center High School, where he received specialized education for his physical and intellectual disabilities, including cerebral palsy. Am. Compl. ¶¶ 7, 15, 17. As a student at Ray Graham, James had an individualized education plan (commonly known as an "IEP") to address his disabilities, which "required physical assistance to perform many acts of daily living, including using the bathroom … ." *Id.* ¶¶ 17-18. Defendant Velarde, who worked at the school as a Special Education Classroom Assistant, was assigned to provide

James with physical assistance. *Id.* ¶ 20. Defendant Reynolds also worked at Ray Graham as a Special Education Classroom Assistant. *Id.* ¶ 12.

On a late March morning in 2018, Velarde and Reynolds gave James a shower and Velarde touched James' penis multiple times. Am. Compl. ¶¶ 21-22. Reynolds saw this happen but did not do anything to stop it. *Id.* ¶ 22. More than two months later, the school administration notified the Chicago Police Department of allegations that James Doe had suffered sexual abuse. *Id.* ¶ 24. Reynolds then revealed to police that he had also observed Velarde touching James' penis on another occasion. *Id.* ¶ 25. The Plaintiffs filed this lawsuit against the Board, Reynolds, and Velarde less than a year later. R. 1; R. 19.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[4] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. Title IX (Count 1)

The Plaintiffs' first claim is for sex discrimination under Title IX, 20 U.S.C. § 1681, *et seq*. "Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173 (2005). *See also* 20 U.S.C. § 1681(a) ("[N]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). Title IX's ban on "discrimination" prohibits a teacher or other school employee from sexually harassing or abusing a student. *See, e.g.*, *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 75 (1992) ("[W]hen a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex. … [T]he same rule should apply when a teacher sexually harasses and abuses a student." (cleaned up)); *Mary M. v. North Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1224-25

(7th Cir. 1997) (analyzing a student's allegations of sexual abuse by a cafeteria worker as a Title IX claim). But because Title IX does not allow for vicarious liability, students who are sexually harassed by school employees are only entitled to recover damages against the school district if a school official with "authority to institute corrective measures" had actual knowledge of, and was deliberately indifferent to, the harassment. *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012). If that hurdle is cleared, a plaintiff in a Title IX case must also adequately allege that (1) the educational institution received federal funding; (2) the harassment was based on sex; and (3) the harassment was so pervasive or severe that it altered the conditions of the plaintiff's education, or deprived the plaintiff of access to educational opportunities or benefits provided by the school. *See North Lawrence Cmty. Sch. Corp.*, 131 F.3d at 1228.

Here, the Board does not dispute that it received federal funding or that the alleged harassment was based on sex. *See* R. 27, Bd.'s Br. at 4-9. Instead, the Board argues that the Plaintiffs failed to adequately allege that "a school official who … had authority to institute corrective measures on the Board's behalf had actual notice of and was deliberately indifferent to Velarde's alleged sexual misconduct." *Id.* at 4. The Board also contends that there are insufficient allegations that James Doe "was deprived of educational opportunities as a result of the sexual misconduct." *Id.* at 4.

Taking the arguments in reverse order, the Board is wrong that the alleged abuse was not severe or pervasive enough to alter James' educational opportunities. Whether misconduct "rises to the level of actionable harassment … depends on a

constellation of surrounding circumstances, expectations, and relationships[.]" *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). There is a distinction between *teacher*-on-student harassment and *peer* harassment: "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits … ." *Davis*, 526 U.S. at 653 (cleaned up). In fact, "courts recognize that harassment by a *teacher* inherently harms students and affects their educational experience: 'No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system.'" *Doe I v. Bd. of Educ. of City of Chi.*, 364 F. Supp. 3d 849, 861 (N.D. Ill. 2019) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998)).

Here, the Plaintiffs allege that "[t]he discrimination and harassment was so severe and pervasive that it altered the conditions of James Doe's education." Am. Compl. ¶ 53. That is admittedly more a statement of conclusion rather than a statement of fact. But there are factual allegations that support it. First, Velarde occupied a position of power in relation to James: Velarde was the classroom assistant and James was the student. *Id.* ¶¶ 17-18, 20. Sure, that is not the traditional teacher-student relationship. But viewing the allegations in James' favor, it is reasonable to conclude that the power imbalance was even greater than the traditional teacher-student relationship, because James suffered from physical and mental disabilities, *id.* ¶¶ 17-18, and Velarde was authorized to interact with James in ways that are

otherwise considered to be quite invasive, *id.* ¶¶ 20-21. Those facts alone are enough to put the Velarde-James relationship at least on the same footing as a traditional teacher-student relationship so that sexual abuse (here, touching James' penis multiple times) by the classroom assistant qualifies as an alteration of James' educational opportunities.

But the Plaintiffs cannot clear the other hurdle to imposing Title IX liability on the Board. Remember that there is no vicarious liability under Title IX, so the Plaintiffs must adequately allege that a school official with authority to take corrective measures on the Board's behalf had actual notice of and was deliberately indifferent to Velarde's alleged sexual abuse. *See Gebser*, 524 U.S. at 290. "School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014). Here, the Plaintiffs fail to adequately plead *who* possessed the requisite knowledge. They argue—unconvincingly—that it is enough to say that "the necessary school officials had actual notice of the improper touching on March 19, 2018, and possibly knew about an even earlier improper touching to James Doe's penis." R. 43, Pls.' Resp. Br. at 8. But aside from Velarde himself, the only other person alleged to have observed the misconduct, or known anything about it, is Reynolds. *See Gebser*, 524 U.S. at 291 ("Where a school district's liability rests on actual notice principles, … the knowledge of the wrongdoer himself is not pertinent to the analysis."). But there is nothing in the Amended Complaint to suggest that Reynolds was a school official with the authority to take corrective measures. Nor do Plaintiffs set forth *facts* suggesting that

any school official with the requisite authority knew about the alleged abuse. So the Amended Complaint falls short of stating a claim against the School District under Title IX. To be sure, at the pleading stage a plaintiff need not necessarily specify the identity of the school official who had knowledge of the abuse. But nothing in the Amended Complaint points to anyone—whether by job title or otherwise—who fits the bill.

What's more, even if the allegations about the Board had sufficiently implicated a school official with the authority to take corrective steps, the Title IX claim would still fail because there are no facts to suggest that a school official knew of Velarde's alleged abuse *at the time it was happening. See St. Francis Sch. Dist.*, 694 F.3d at 872-73. Nor are there any facts to suggest that Velarde had some known history of sexual misconduct that would impute some sort of knowledge on the Board's behalf. *Cf. Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 605-606 (7th Cir. 2008) (explaining in *dicta* that even if a school district did not know a teacher was harassing a particular plaintiff, it might still be found to have "actual knowledge" if the teacher was a known "serial harasser"). Where a school official learns of sexual harassment against a plaintiff only *after* the fact, they do not have "actual" notice or knowledge within the meaning of Title IX. *See, e.g.*, *St. Francis Sch. Dist.*, 694 F.3d at 872-73 (school officials who heard only *suspicions* of sexual misconduct, and then only learned about teacher's sexual abuse of victim after-the-fact, did not have "actual knowledge" under Title IX); *Trentadue v. Redmon*, 619 F.3d 648, 653 (7th Cir. 2010) (no actionable knowledge where school officials only found

out about instructor's sexual abuse of student several weeks later). Here, even taking the Plaintiffs' allegations as true, the only plausible characterization of the Amended Complaint is that school officials found out about the harassment *after* it happened. *See* Am. Compl. ¶ 24 ("[O]n May 22, 2018, the Ray Graham Training Center High School administration notified the Chicago Police Department regarding allegations of sexual abuse to James Doe.").

Nevertheless, the Plaintiffs argue—solely on the basis that the pleadings should be viewed in their favor at the motion-to-dismiss stage—that the Court should simply fill in the gap and infer that the Board had "actual knowledge" between "the date in which Reynolds observed Velarde improperly touch[ing] James Doe's penis" and "the date that police were notified … ." Pls.' Resp. Br. at 9. This takes notice pleading too far. That is, the complete *absence* of factual allegations cannot form the basis of a reasonable inference in the Plaintiffs' favor. Take, for example, *Swanson v. Baker & McKenzie, LLP*, 527 Fed. App'x 572 (7th Cir. 2013) (non-precedential disposition). Swanson alleged that (1) she listed her former employment with the defendant law firm on job applications; (2) the law firm's human resources manager could not find Swanson in their system and could "neither confirm nor deny her employment there"; and (3) prospective employers kept rejecting Swanson's job applications. *Swanson*, 527 Fed. App'x at 573-74. Based on those allegations, Swanson implored the district court to infer that the defendant "must have told prospective employers something adverse"—if defendant told "prospective employer[s] that it could neither confirm nor deny her employment there," she

argued, "then the prospective employer[s] would conclude that she was lying and would refuse to hire her." *Id.* at 574. But the Seventh Circuit affirmed the district court's dismissal of Swanson's retaliation claim, holding that "in the absence of any additional facts that would support that final inferential leap, this is the type of speculation that [*Twombly* and *Iqbal*] identify as insufficient to pass muster under Rule 12(b)(6)." *Id.* (cleaned up). That is the same sort of inferential leap that the Plaintiffs are asking the Court to take in this case.

The outcome might have been different if, say, the Plaintiffs alleged that they left a voice-mail for the school principal to report sexual harassment by Velarde. In that case, even if the Plaintiffs did not allege a direct conversation with the principal (or even that the principal *heard* the message), it would still be reasonable to infer that a school principal listens to voice-mails and thus obtained actual knowledge of the misconduct. But the Plaintiffs allege nothing of the sort. So, absent any well-pled allegations of actual knowledge and deliberate indifference, the Plaintiffs' Title IX claim must be dismissed. But given that the Plaintiffs have amended their complaint only once, this dismissal is without prejudice. If the Plaintiffs think that they can fix this deficiency (relying on a reasonable basis in fact), then they must file the second amended complaint by April 27, 2020. Otherwise, the dismissal will convert to a dismissal with prejudice as to this claim.

## B. Rehabilitation Act and ADA (Counts 2 and 3)

Moving on, the Plaintiffs also bring two claims against the Board under § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and Title II of the ADA, 42 U.S.C.

§ 12132. Both statutes generally prohibit discrimination in public programs on the basis of disability. *H.P. by & through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018). Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act likewise bans disability discrimination by public entities, but does not allow mixed-motive claims (whereas the ADA does). *See* 29 U.S.C. § 794(a) (banning discrimination "*solely* by reason of" the person's disability) (emphasis added); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019). That said, because "Title II of the ADA was modeled after § 504 of the Rehabilitation Act[,]" and because "the elements of claims under the two provisions are nearly identical," the Seventh Circuit has held "that the standards applicable to one act are applicable to the other." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999).

The Board takes it one step further by arguing that the Plaintiffs' burden under Title II of the ADA and § 504 of the Rehabilitation Act is the same as that under Title IX. Bd.'s Br. at 10-11. In other words, as with the Plaintiffs' Title IX claim, the Board believes Counts 2 and 3 should be dismissed because the Plaintiffs do "not allege that a school official with authority to institute corrective measures on the Board's behalf had actual notice of and was deliberately indifferent to Velarde's alleged inappropriate touching." *Id.* at 10. It is true that the text of all three statutes

is very similar (except that Title IX prohibits discrimination on the basis of sex rather than disability). *Compare* 42 U.S.C. § 12132, *with* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance … ."), *and* 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance … ."). And because the Plaintiffs fail to challenge the Board on this point, they forfeit the argument. *See* Pls.' Resp. Br. at 9-10. In fact, the Plaintiffs implicitly concede that the same standard applies to all three statutes when they explain that under § 504 or Title II, "a plaintiff must show that: (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4*) the defendant knew about the harassment*, and (5) the defendant was deliberately indifferent to the harassment." *Id.* at 9 (emphasis added). These elements are nearly identical to those applicable in Title IX claims. *See supra* Section III(A).

But even though the Plaintiffs forfeited the argument, it is worth noting—for the sake of completeness—that neither the Supreme Court nor the Seventh Circuit has decided whether Title II of the ADA and § 504 of the Rehabilitation Act permit vicarious liability, and other circuits are split. *See Ravenna v. Vill. of Skokie*, 388 F.

Supp. 3d 999, 1004-1006 (N.D. Ill. 2019). *Compare, e.g.*, *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality … the public entity is liable for the vicarious acts of its employees."), *with Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012) (holding that Supreme Court's rejection of respondeat superior and constructive notice principles for Title IX claims is also the correct standard for § 504). But the Seventh Circuit provided some guidance when it acknowledged that "[b]ecause the program-specific language of Title IX is identical to that of § 504 … the Supreme Court has consistently relied on case law developed under Title IX in interpreting § 504." *Foss v. City of Chicago*, 817 F.2d 34, 36 n.1 (7th Cir. 1987) (cleaned up) (collecting cases). *See also Waldrop v. Southern Co. Servs.*, 24 F.3d 152, 157 n.5 (11th Cir. 1994) ("Section 504 was passed in 1973, just a year after Title IX. The statutes are virtually identical … with the principal exception being the class protected. As a result, the [Supreme] Court repeatedly analogized the two statutes."). Moreover, the Seventh Circuit has held that "when a statute fails to provide individual or personal liability, vicarious[] liability 'based on agency principles' is *not* available." *Ravenna*, 388 F. Supp. 3d at 1005 (quoting *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1022-28 (7th Cir. 1997)). Like Title IX, neither Title II of the ADA nor § 504 of the Rehabilitation Act permits individual liability. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015). On this basis, the Board is likely correct that the requirements for claims under Title IX also apply to claims under Title II of the ADA

and § 504 of the Rehabilitation Act. And given that the Plaintiffs' allegations under Counts 2 and 3 suffer from the same factual gap as their allegations under Title IX on actual knowledge and deliberate indifference—*compare* Am. Compl. ¶¶ 64-67, *and id.* ¶¶ 76-79, *with id.* ¶¶ 51-54—the Plaintiffs' claims under Title II of the ADA and § 504 of the Rehabilitation Act are also dismissed (with the same deadline for a Second Amended Complaint). *See supra* Section III(A).

### C. Section 1983

The Plaintiffs also bring constitutional-rights claims against the individual defendants under 42 U.S.C. § 1983. Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a § 1983 claim, a plaintiff must show that they were "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). Relying on § 1983, the Plaintiffs allege that Velarde violated James Doe's rights under the Fourth Amendment (Count 5), as well as under the Equal Protection Clause (Count 4) and the Due Process Clause (Count 6) of the Fourteenth Amendment. Am. Compl. ¶¶ 82-103. The Plaintiffs also allege that Reynolds violated James Doe's constitutional rights when he failed to intervene to prevent Velarde from violating James Doe's Fourth and Fourteenth Amendment rights (Count 10). *Id.* ¶¶ 120-126. The Court will discuss each claim in turn.

### 1. Equal Protection (Count 4)

The Equal Protection Clause of the Fourteenth Amendment prohibits state and local governments from discriminating on the basis of certain protected classifications and also bars governments from treating a person irrationally as a so-called "class of one." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). For an equal-protection claim based on class membership to survive a motion to dismiss, a plaintiff must sufficiently allege that they were treated differently by the government based on membership in a protected class, and that the defendant acted with discriminatory intent. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). The other form of equal-protection claim is different: a class-of-one claim requires the plaintiff to allege that (1) a state actor intentionally treated them "differently than others similarly situated, and (2) there is no rational basis for the difference in treatment." *Reget*, 595 F.3d at 695. Here, the Plaintiffs bring an equal-protection claim against Velarde under both theories. *See* Am. Compl. ¶¶ 82-89; Pls.' Resp. Br. at 17-18.

Under the class-membership theory, the Plaintiffs allege that Velarde discriminated against James Doe based on his sex or his disability,[5] or both. Am.

---

[5]The Supreme Court has held that disability is not a "suspect classification" under the Equal Protection Clause, so a plaintiff alleging an equal-protection violation on the basis of their disability also has to show that the state actor's discrimination was not rationally related to a legitimate state interest. *See Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366-68 (2001); *United States v. Harris*, 197 F.3d 870, 874-75 (7th Cir. 1999). *See also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985) (unlike disability, sex-based discrimination receives a heightened standard of scrutiny because "the sex characteristic frequently bears no relation to ability to perform or contribute to society.") (cleaned up); *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003) (where corporation alleged that city violated its equal protection rights by determining that its proposed drug-treatment facility was not permitted in that area zone, the rational relationship test applied because drug addicts are not a suspect class). Here, for clarity and convenience's sake, this Opinion will not address this requirement separately—instead,

Compl. ¶ 84. In the next paragraph, the Plaintiffs allege that Velarde "victimized James Doe based on his membership in a certain class of individuals." Am. Compl. ¶ 85. Those two paragraphs make it quite plain that the Plaintiffs are alleging sex and disability discrimination, so Velarde's argument to the contrary, R. 25, Velarde Br. at 4, is rejected.

Velarde also contends that the allegations are insufficient to plead that his conduct was motivated by James Doe's sex or disability. Velarde Br. at 4. But that is wrong. It is important to remember that, at this early stage of the case, the Plaintiffs need not plead more facts than necessary to give Velarde "fair notice of what the claim is and the grounds upon which it rests." *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cty.*, 804 F.3d 826, 832 (7th Cir. 2015). In the analogous setting of employment-discrimination cases, the Seventh Circuit has emphasized that there is no heightened pleading standard in those types of cases, and no need to plead the elements of a *prima facie* case. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014). Fair notice of the claim is all that is required. *Id.*

Here, the Plaintiffs adequately allege that Velarde abused James Doe based on his sex, his disability, or both. *See, e.g.*, Am. Compl. ¶ 84 ("Defendant Velarde abused, harassed, and otherwise discriminated against James Doe based on sex and/or disability."). For one, the fact that Velarde allegedly improperly touched James Doe's *genitals* on multiple occasions inherently implicates James Doe's sex, at least at the pleading stage. *See id.* ¶¶ 22, 25. *See also Bohen v. City of East Chi., Ind.*, 799

---

because the class-of-one equal-protection claim must also pass a rational-relationship test, the Court's analysis on that point applies to the Plaintiffs' disability-based claim too.

F.2d 1180, 1185 (7th Cir. 1986) (under Equal Protection Clause, discrimination based on sex includes sexual harassment). Likewise, the Amended Complaint plausibly connects Velarde's misconduct to James Doe's membership in a class of disabled students by alleging that Velarde sexually abused Doe while working as a Special Education Classroom Assistant and having physical access to James Doe in the shower. *See* Am. Compl. ¶¶ 20-22, 84-85. Because Velarde could not have engaged in the alleged misconduct had it not been for James Doe's disability status, the Plaintiffs' claim that Velarde treated James Doe differently *because* of that disability is plausible on its face.[6] The equal-protection claim is adequately described to fulfill the purpose of pleading: to put the defense on notice of what the claim is.

Velarde further argues that the equal-protection claim should be dismissed because the Plaintiffs failed to "sufficiently allege that James Doe was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Velarde Br. at 3 (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012)). Again, Velarde is demanding too much at the pleading stage: the Plaintiffs are not required to plead specific comparisons to similarly situated students. The Seventh Circuit has "repeatedly confirmed that

---

[6]Velarde's argument that the "Plaintiffs admit as much when they state that 'the misconduct described … is not rooted in any form of discrimination including sex or disability[,]'" Velarde Br. at 4 (quoting Am. Compl. ¶ 94), lacks merit. Velarde omits that the Plaintiffs' allegation applied to "the misconduct described in *this Count*"—that is, the Fourth Amendment claim, *not* the equal protection claim. *See* Am. Compl. ¶ 94 (emphasis added). Even if the Fourth Amendment claim relies "on the same set of facts" as the equal protection claim, Velarde Br. at 4, the Plaintiffs referred to the "misconduct" as the "unreasonable search and seizure," and were simply clarifying their legal theory under the Fourth Amendment.

plaintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (cleaned up). And the same is true for class-membership claims, especially where the complaint plausibly alleges discriminatory intent, as it does here. *See, e.g.*, *Taylor v. Nunez*, 2019 WL 5393996, at *4 (N.D. Ill. Oct. 22, 2019); *Myers v. Joliet Twp. High Sch. Dist. No. 204*, 2013 WL 3874057, at *4 (N.D. Ill. July 26, 2013). Nothing more is needed right now.

It is worth nothing one final point on the equal-protection claim, in particular on the class-of-one theory. Although not explicitly developed by Velarde, he tiptoes around an argument that his conduct was benign—that "[a]ll the Complaint alleges … is that in the course of cleaning James Doe, pursuant to his responsibilities under the IEP, he touched James Doe's penis and that he had done so once in the past." Velarde Br. at 4.[7] The idea seems to be that government conduct in class-of-one claims carry a presumption of rationality to ensure that not every tort committed by a state actor mutates into a federal constitutional injury. *See Geinosky*, 675 F.3d at 747; *Walker v. Samuels*, 543 Fed. App'x 610, 611 (7th Cir. 2013) (non-precedential disposition). So "even at the pleadings stage, all it takes to defeat a class-of-one claim is a *conceivable* rational basis for the difference in treatment." *Miller*, 784 F.3d at 1121 (cleaned up). But even with the applicable presumption of rationality, at this

---

[7]Velarde repeats this characterization throughout his opening brief. *See, e.g.*, Velarde Br. at 7 (describing the allegations as Velarde simply "touch[ing] James Doe's penis in the course of cleaning him[.]"). For the reasons discussed above, *supra* Section III(C)(1), the alleged facts do not permit such an inference in Velarde's favor (for any of the Plaintiffs' claims) at this stage of the litigation.

stage the Court must still draw any plausible inferences in the *Plaintiffs'* favor, not Velarde's. *See Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) ("The solution is to take as true all of the complaint's allegations and reasonable inferences that follow, and then apply the resulting facts in light of the deferential rational basis standard." (cleaned up)). So, taking the Plaintiffs' allegations as true, the Amended Complaint does not reveal any conceivable rational basis for why Velarde would need to "improperly" touch James Doe's penis multiple times in the shower—and on more than one occasion—without James Doe's consent. *See, e.g.*, Am. Compl. ¶¶ 22, 25, 117. And on that note, the Plaintiffs' allegation that Velarde touched James Doe "improperly" is *not* impermissibly conclusory. It is true that, in a pleading, adverbs often obscure the concrete facts that are needed to understand the claim. But context matters. And in the context of the sexual misconduct alleged here, nothing more is needed at the pleading stage to distinguish improper touching from providing legitimate physical assistance in the shower.

In sum, both forms of the equal-protection claim are adequately stated. Velarde's motion to dismiss Count 4 must be denied.

### 2. Unreasonable Search and Seizure (Count 5)

The Plaintiffs also assert a Fourth Amendment claim against Velarde for unreasonable search and seizure. Am. Compl. ¶¶ 90-96. The Fourth Amendment, applicable to the states and local governments through the Fourteenth Amendment, "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive" conduct by state actors. *See Skinner v. Ry. Labor Execs.'*

*Ass'n*, 489 U.S. 602, 613-14 (1989). On this claim, Velarde argues—and he is right—that the allegations of what he did to James Doe do not amount to a search or a seizure. Velarde Br. at 5-6.

First, no facts suggest that James Doe was "searched." An unlawful search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed" by some sort of examination to find something. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "When the Fourth Amendment was ratified, as now, to 'search' meant to 'look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.'" *Doe v. Heck*, 327 F.3d 492, 509-10 (7th Cir. 2003) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 n.1 (2001)). Here, the Plaintiffs' allege that Velarde "improperly touched" James Doe, but that allegation does not permit an inference that Velarde was "searching" James Doe for something within the meaning of the Fourth Amendment.

The Plaintiffs' seizure claim totters on an even weaker foundation. As a threshold matter, "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement … but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (cleaned up) (emphasis in original). Here, there are *no* facts to suggest that Velarde's actions were motivated by an intent to restrict James Doe's freedom of movement—the allegation that Velarde improperly touched James does not give rise to an

inference that Velarde intended to prevent James from moving. Moreover, a person is "seized" within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in their position] would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). For encounters where someone is either in their own home or restricted in some other way, the more relevant question is "whether a reasonable person would feel free to decline the [defendant's] requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also White v. City of Markham*, 310 F.3d 989, 994 (7th Cir. 2002). In this case, the "reasonable person" would arguably need to have similar disabilities to be in James Doe's "position." *See, e.g.*, *Heck*, 327 F.3d at 510 (determination that "no reasonable child would have believed he was free to leave the nursery" factored in age as part of the "totality of circumstances"). But even so, the fact of disability does not, in and of itself, automatically mean the person's movement is restrained. Here, the Plaintiffs have not adequately alleged that Velarde acted in such a way that a reasonable, disabled student in James Doe's position would not have felt free to leave the bathroom or terminate the shower. Nor, for that matter, are there any allegations that James Doe's freedom of movement was *actually* restrained.[8] *See Mendenhall*, 446 U.S. at 553 ("[A] person is 'seized' only when, by means of physical force or a show of

---

[8] The Court acknowledges that whether Velarde did restrict James Doe's freedom of movement would be a closer call if James Doe's disability already severely limited his ability to move on his own. But that limitation is not pled, and in any event, there is no need to reach that question given the absence of *any* allegations that could make the Fourth Amendment claim plausible on its face.

authority, his freedom of movement is restrained."). For all these reasons, the Plaintiffs' Fourth Amendment claim against Velarde is dismissed. In light of the early stage of the case, the dismissal is without prejudice for now, but it does not seem that this deficiency can be fixed with other factual allegations.

### 3. Substantive Due Process (Count 6)

Velarde also seeks to dismiss the Plaintiffs' substantive due-process claim. Velarde Br. at 7-8. In their Amended Complaint, the Plaintiffs allege that Velarde's sexual abuse of James Doe violated his right to bodily integrity as protected by the substantive aspect of the Due Process Clause. Am. Compl. ¶¶ 98-99; *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) (substantive due process violations include infringing on students' protected liberty interest in bodily integrity). There are two types of substantive due process violations: "the first occurs when the state actor's conduct is such that it shocks the conscience," and the "second occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause*." Grindle*, 599 F.3d at 589 (cleaned up). Here, Velarde challenges both forms of the Plaintiffs' substantive due process claim. Velarde Br. at 7. As explained next, however, the allegations are sufficient.

### a. Substantive Due Process and Equal Protection

Before deciding whether the Plaintiffs adequately alleged a substantive due process claim, there is a threshold question to take up: considering that the Supreme Court has warned against invoking the substantive component of the Due Process Clause if a more narrow provision applies, can the Plaintiffs proceed on a substantive-

due-process theory at all, given that their more specific Equal Protection claim survives? Specifically, the Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). As important as that principle is, however, it is not automatically applied: courts pay close attention to the precise description of the right at stake. *See Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006) (whether another textual source covers a substantive due process claim depends on the protections invoked by the plaintiff).

For example, in *Wilson v. Cook County*, the Seventh Circuit determined that, although "sexual harassment claims brought under § 1983 are traditionally analyzed in the context of the Equal Protection Clause[,] … the substantive component of the Due Process Clause may also come into play when a plaintiff alleges that her *bodily integrity* was violated by a state actor." 742 F.3d 775, 780-81 (7th Cir. 2014) (emphasis added). *Wilson* demonstrates that, in certain circumstances, allegations can give rise to equal-protection and substantive due process claims that are *both* viable.

Indeed, the Seventh Circuit's decision in *Hughes v. Farris*, 809 F.3d 330 (7th Cir. 2015) exemplifies the distinction between the two types of claims. In *Hughes*, the Seventh Circuit held that a civilly committed detainee's allegations of cruel and inhumane treatment stated claims under both the Due Process Clause *and* the Equal Protection Clause. 809 F.3d at 334. Specifically, the detainee alleged that an

employee at the treatment facility abused him due to his sexual orientation by threatening him with violence and berating him with homophobic epithets. *Id.* at 332. *Hughes* framed the due-process claim as implicating a right to safety and protection from cruel and unusual punishment (which includes threats of grave violence and verbal abuse). *Id.* at 334. In contrast, *Hughes* described the equal-protection claim as implicating a right to be free from discrimination on the basis of sexual orientation. *Id.* With the two different types of rights at stake, the due-process claim granted a right to safety that did *not* hinge on membership in a protected class, thus differentiating it from the equal-protection claim. *See Koutnik*, 456 F.3d at 781 n.2.

Just so here. James Doe's allegations that Velarde sexually abused him implicate two independent rights: (1) the right to be free from unequal treatment under the Equal Protection Clause; and (2) the right to bodily integrity and personal security under the Due Process Clause, regardless of the defendant's motive. Put another way, the sexual assault of a student—*regardless* of the defendant's motivations—could constitute a substantive due process violation on its own, because the Due Process Clause's guarantees of bodily integrity are triggered regardless of how others are treated. *See Wudtke v. Davel*, 128 F.3d 1057, 1063-64 (7th Cir. 1997) (holding that sexual assault by a state actor can violate the fundamental right to bodily integrity under the Due Process Clause); *see also id.* (holding that substantive due process claim was adequately stated based on allegations of "serious physical assault," such as the victim being touched, kissed, and forced to perform fellatio

without consent).[9] Like in *Wudtke*, because the Plaintiffs in this case "alleged an extreme and outrageous violation of [James Doe's] person committed by a state actor," the alleged sexual abuse can be characterized as both sex discrimination under the Equal Protection Clause and as a violation of substantive due process. *See id.* at 1063. The availability of the equal-protection claim does not preclude the Plaintiffs from also bringing the substantive due process claim.

### b. Substantive Due Process

Moving on to the adequacy of the substantive due process allegations, in determining whether a plaintiff has stated a claim for substantive due process, the Court's "first duty is to provide a careful description of the liberty interest that Mr. Doe seeks to have protected." *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 768 (7th Cir. 2004) (cleaned up). Next, the Court must determine whether that interest is "fundamental"—that is, whether it is so deeply rooted and sacrosanct that no amount of process would justify its deprivation. *Christensen v. Cty. of Boone, Ill.*, 483 F.3d 454, 462 (7th Cir. 2007). If so, the Court must ask "whether the government has interfered directly and substantially with the plaintiffs' exercise of that right." *Id.* (cleaned up). And "finally, if a fundamental right has been impaired, [the Court asks] whether the governmental action can find reasonable justification in the service of a

---

[9]The Supreme Court also implicitly recognized that type of claim in *United States v. Lanier*, when it explained that an earlier case—*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)—did *not* hold that "there is no constitutional right to be free from assault committed by state officials themselves outside of a custodial setting." *Lanier*, 520 U.S. 259, 272 n.7 (1997). *See Wudtke*, 128 F.3d at 1063; *see also Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989) ("Reasonable officials would have understood the 'contours' of a student's right to bodily integrity … to encompass [the] right to be free from sexual assaults by his or her teachers.").

legitimate governmental objective, or if instead it more properly is characterized as arbitrary, or conscience shocking, in a constitutional sense."[10] *Id.* (cleaned up).

On the first step, the Court's "careful description of the asserted right must be … specific and concrete, one that avoids sweeping abstractions and generalities." *Doe v. City of Lafayette*, 377 F.3d at 769 (cleaned up). Here, given the factual constraints set by the Amended Complaint, this task is not too difficult: James Doe, as a public school student, asserts a right to be free from sexual abuse by school employees. *See, e.g.*, R. 19, Am. Compl. ¶¶ 1, 98-99. Likewise, the second requirement is also satisfied: courts have recognized that students have a fundamental right to bodily integrity, *see, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 672 (1977), and that sexual abuse by a state actor can constitute a violation of that right, *see, e.g.*, *Wudtke*, 128 F.3d at 1063-64. On the facts alleged here, Velarde "interfered directly and substantially" with James Doe's right to bodily integrity. *See Christensen*, 483 F.3d at 462. And, needless to say, there is no legitimate governmental objective that could reasonably be served by the repeated, non-consensual, improper touching of a student's genitals. *See Wudtke*, 128 F.3d at 1062-63 (plaintiff's sexual assault claims invoked substantive

---

[10]As described above, *supra* Section III(C), the Supreme Court has defined two categories of substantive due process claims: one protecting an individual's fundamental liberty interests, and another protecting against the exercise of governmental power that shocks the conscience. *United States v. Salerno*, 481 U.S. 739, 756 (1987). But despite conscious-shocking behavior constituting a separate type of substantive due process claims, courts (including the Supreme Court) have also incorporated a "conscience-shocking" test into the first type—the analysis of whether a fundamental liberty interest has been impaired. *See, e.g.*, *Lewis*, 523 U.S. at 846-50; *Christensen*, 483 F.3d at 461-62. For purposes of this Opinion, there is no need to try to unblur the lines between the two types of claims, because the Plaintiffs' allegations meet the stricter standard—that is, the alleged sexual abuse is conscious-shocking.

due process because "[n]o amount of predeprivation process would have made [defendant's] conduct … palatable."); *Lewis*, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level[.]").

Likewise, the Plaintiffs have also plausibly alleged that Velarde's conduct shocks the conscience. As discussed above, *supra* Section III(A), Velarde's relationship to James Doe is comparable to that of a teacher and their student, and courts have recognized that a teacher's sexual abuse of a student "'is reprehensible and undermines the basic purposes of the educational system[,]'" *Doe I v. Bd. of Educ. of City of Chi.*, 364 F. Supp. 3d at 861 (quoting *Gebser*, 524 U.S. at 292). But more than that, the alleged facts support the inference that, because Velarde was entrusted with the responsibility to care for James Doe's needs as a *disabled* student, Velarde's alleged misconduct was especially conscience-shocking. *See Lewis*, 523 U.S. at 846 ("[T]he Due Process Clause was intended to prevent government officials from abusing their power[,]" and "the cognizable level of executive abuse of power [i]s that which shocks the conscience." (cleaned up)).

Because the Plaintiffs have adequately alleged a Fourteenth Amendment substantive due process claim, Velarde's motion to dismiss Count 6 is denied.

### 4. Failure to Intervene (Count 10)

The Plaintiffs' last claim under § 1983 is a failure-to-intervene claim against Defendant Reynolds who, like Velarde, also worked as a Special Education Classroom Assistant at Ray Graham. Am. Compl. ¶¶ 12, 120-26. As the nature of this claim

implies, the Plaintiffs do not allege that Reynolds *himself* improperly touched James Doe; instead, they allege that Reynolds' failure to prevent *Velarde* from doing so caused James to suffer harm. *Id.* ¶¶ 121-25. "The Seventh Circuit has consistently recognized that a state actor's failure to intervene in the violation of another's constitutional rights may render him liable" under § 1983. *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1053 (N.D. Ill. 2016) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994), and *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)).

Here, Reynolds' only challenge on the failure-to-intervene claim is that the Plaintiffs "failed to plead a constitutional violation committed by Velarde." R. 37, Reynolds Br. at 3. *See Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) ("In order for there to be a failure to intervene … there must exist an underlying constitutional violation." (cleaned up)). But because the Plaintiffs have adequately alleged constitutional violations by Velarde under the Equal Protection Clause (Count 4) and the Due Process Clause (Count 6), *see supra* Sections III(C)(1) and (C)(3), Reynolds' motion to dismiss must fail.

### D. State-Law Claims

With the federal claims decided, next up are the Plaintiffs' state-law claims. As in all things legal, jurisdiction comes first. In particular, because all of the federal claims against the Board have been dismissed (though without prejudice for now), the Court must consider whether to relinquish supplemental jurisdiction over the state-law claims against the Board. Initially, there is no question that, under 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over the state-law claims

(including those advanced against the Board) because those claims are based on the same factual allegations as the federal claims. The synchronism of facts makes the state claims "so related" to the federal claims "that they form part of the same case or controversy … ." 28 U.S.C. § 1367(a). That said, federal district courts usually relinquish supplemental jurisdiction over state claims "whenever all federal claims have been dismissed prior to trial[,]" *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). This presumption of relinquishment is written into 28 U.S.C. § 1367(c)(3), which gives district courts the discretion to "decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed *all claims* over which it has original jurisdiction[.]" (emphasis added). *See Hansen*, 551 F.3d at 607.

In this case, however, not *all* federal claims over which the Court has original jurisdiction have been dismissed. Specifically, the Court still has federal-question jurisdiction over the § 1983 claims against Velarde and Reynolds. So the presumption to relinquish supplemental jurisdiction has not been triggered.[11] *See Hansen*, 551 F.3d at 607-608 (holding that retention of supplemental jurisdiction over state claims against school district was proper where federal claims against co-defendant remained). *See also, e.g.*, *Wilson v. Adams*, 901 F.3d 816, 823 (7th Cir. 2018)

---

[11]Courts in other circuits have also interpreted § 1367 in this way. *See, e.g.*, *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (reinstating state claims against one defendant after reversing dismissal of § 1983 claims against other defendants); *Palmer v. Hosp. Auth. of Randolph Cty.*, 22 F.3d 1559, 1568-69 (11th Cir. 1994) (holding that, where it is undisputed that jurisdiction exists for federal claim against *one* of the defendants, supplemental jurisdiction over related state-law claims against *other* defendants is appropriate); *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 468 (D.D.C. 1994) (retaining jurisdiction over state-law claims against one defendant where Title VII federal claims against co-defendant remained).

(affirming retention of supplemental jurisdiction over state-law negligence claim even though all federal claims were dismissed on summary judgment); *Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 513 (7th Cir. 2010) (explaining that "[a]lthough a district court may relinquish supplemental jurisdiction following the dismissal of all federal claims, it is not required to do so, unless the federal claims are frivolous and so do not engage the jurisdiction of the federal courts."); *Groce*, 193 F.3d at 500 ("[O]ur case law makes clear that the district court did not automatically lose [supplemental] jurisdiction once it granted summary judgment on [plaintiff's] ADA claim."). What's more, "[b]ecause the state and federal claims arise from a common factual nucleus, judicial economy would best be served by deciding all of the claims in this Court[,]" especially given that "the state claims are unlikely to require significantly more factual development than already will be required by the remaining federal claims." *Satkar Hosp. Inc. v. Cook Cty. Bd. of Review*, 819 F. Supp. 2d 727, 739 (N.D. Ill. 2011). For these reasons, the Court retains supplemental jurisdiction over the state-law claims against the Board despite the dismissal of the federal claims against it.

### 1. Negligence (Count 7) and Willful and Wanton Conduct (Count 8)

With jurisdiction secure over the state claims against the Board, it is time to assess them. The Plaintiffs allege that the Board acted willfully and wantonly (or at the very least, negligently) by failing to prevent and report the improper touching; failing to "reasonably direct, instruct, supervise, monitor, and train its agents … to ensure timely and proper reporting of sexual abuse," to "be aware of the care and

treatment needed for each student"; and failing "to adequately conduct reference checks, background checks, or employment screenings of agents … ." *See* Am. Compl. ¶¶ 104-15. The Board argues that the negligence and willfulness claims are barred by the Local Governmental and Governmental Tort Immunity Act, 745 ILCS 10/1-101, *et seq.* Bd.'s Br. at 12-14. The Tort Immunity Act "governs whether and in what situations local governmental units are immune from civil liability." *Reyes v. Bd. of Educ. of City of Chi.*, 139 N.E.3d 123, 133 (Ill. App. Ct. 2019) (cleaned up). Here, the Board relies primarily on Sections 2-103, 2-205, and 4-102 of the Act, which provide immunity even for willful and wanton misconduct, and Section 3-108, which provides immunity only for negligent acts. Bd.'s Br. at 12-14. *See Doe I v. Bd. of Educ. of City of Chi.*, 364 F. Supp. 3d at 863 (citing *Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1097-98 (Ill. 2001)); *Reyes*, 139 N.E.3d at 138-39. The Board also argues that the willfulness claim should be dismissed because the Plaintiffs fail to allege that the Board acted with deliberate indifference. Bd.'s Br. at 14-15.

### a. Sections 2-205 and 2-103

Sections 2-205 and 2-103 of the Act immunize individual public employees and local public entities from liability for any injuries "caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103 (immunizing public entities); *see id.* at § 2-205 (immunizing public employees). The Board points to various allegations in the Amended Complaint that fault the Board for failing to follow and enforce its own *policies.*[12] *See* R. 51, Bd. Reply Br. at 6-8; *see, e.g.*, Am.

_____

[12]The Board argues for the first time on reply that the Act bars Plaintiffs' negligence and willfulness claims because the Plaintiffs also allege violations of state law, not just Board

Compl. ¶ 43 ("Despite the foregoing policies regarding sexual discrimination and student-staff boundaries, Defendant Board acted … in a manner that was deliberately indifferent to the plainly obvious risk of sexual misconduct to its students … ."). The Board then argues that its policies—like enactments or ordinances under the Tort Immunity Act—have the force of *law* because they "are generally adopted as part of business conduct at its regularly scheduled meetings," Bd.'s Br. at 13, and so for these reasons, Counts 7 and 8 should be dismissed. This argument fails for three reasons.

First, on the current record, it is a mystery whether the Board's policies fall under the Act's definition of "enactment" or "law." The record as it stands does not explain *how* the Board's rules and policies are established. "Not everything passed by the Board is a law under the Act." *Reyes*, 139 N.E.3d at 135. In *Reyes*, the Illinois Appellate Court was "not persuaded that 'any law' under section 2-205 include[d] the three [Board] policies at issue" in the case. 139 N.E.3d at 134. Specifically, there was no context for how the policies were put into effect, whether the guidelines were rules or just suggestions, and whether the guidelines were established under 105 ILCS 5/34-19 and so "ha[d] the force of ordinances." *Id.* at 135. The Board faces the same

---

rules and policies. *See* Bd. Reply Br. at 7-8 ("Plaintiffs alleged that the Board failed to follow and enforce its own policies and other state laws and therefore Sections 2-103 and 2-[2]05 of the Act must apply."). But arguments raised for the first time on reply are forfeited, so the Board's arguments on this point will not be considered. *See, e.g.*, *Carroll v. Lynch*, 698 F.3d 561, 564 n.2 (7th Cir. 2012). In any event, as discussed in the text, so long as the claims adequately allege independent violations of *common* law, the fact that they also violate state law would not trigger the Tort Immunity Act and require dismissal of the common-law claims; it would just mean that the Plaintiffs cannot rely on state statutes to impose liability on the Board.

factual gap here. Although the Board argues that the "policies and rules are generally adopted as part of business conducted at its regularly scheduled meetings, [and so] they have the force of ordinances," Bd.'s Br. at 13, this allegation of course was *not* pled in the Amended Complaint. Ultimately, the Board's argument on this point is more appropriate for a summary judgment motion.

Second, unless the factual record develops in a surprising way, the Board's argument that its policies fall within the Act's definitions of "enactment" and "regulation" is also not likely to prevail as a matter of law. As *Reyes* explained—and as the Board effectively concedes—none of the relevant definitions in the Act include the word "policy." *Reyes*, 139 N.E.3d at 134. *See, e.g.*, Bd.'s Br. at 13 ("Section 1-205 of the Act defines 'law' to include 'enactments.' Section 1-203 states that '[e]nactment means a constitutional provision, statute, ordinance or regulation.' Section 1-208 defines 'regulation' to include rules, regulations, orders and standards 'having the force of law.'").[13] Indeed, *Reyes* reasoned, dictionary definitions define "policy" as something different from binding law: Black's Law Dictionary defines policy as "the general principles by which a government is guided in its management of public affairs" and Merriam-Webster Online defines policy "as a definite course or method of action selected to guide and determine present and future decisions[.]" *Reyes*, 139

---

[13]Because the Amended Complaint contains no allegations that the Board violated its own *rules*, the Board cannot circumvent the problem that none of the definitions in the Act contain the word "policy" (even if they might contain the word "rule"). *See, e.g.*, Bd.'s Br. at 13 ("Section 1-208 defines 'regulation' to include rules, regulations, orders and standards 'having the force of law.' Because the Board's policies and rules are generally adopted as part of business conducted at its regularly scheduled meetings, they have 'the force of ordinances.'") (cleaned up)).

N.E.3d at 134 (cleaned up). In other words, "[t]hese definitions indicate that a policy does not necessarily prescribe a mandatory course of conduct, unlike an ordinance or regulation" under the Act. *Id.*

In any event, the Board's argument under Sections 2-205 and 2-103 of the Act also fails because the Plaintiffs assert general common-law duties, not just violations of the Board's policies. As discussed above, Sections 2-205 and 2-103 immunize public employees and entities only from liability for injuries resulting from "adopting or failing to adopt an enactment or by failing to enforce any law," 745 ILCS 10/2-205 and 2-103, *not* from breaches of common-law duties. In other words, regardless of what the Board's policies say, the Plaintiffs adequately allege that the Board owed James Doe certain common-law duties—such as a duty to "adequately conduct reference checks, background checks, or employment screening of agents, servants, and/or employees." *See* Am. Compl. ¶ 107(e).

In short, Sections 2-205 and 2-103 of the Act do not bar the Plaintiffs' claims for negligence and willful and wanton misconduct.

### b. Section 4-102

Next, the Board invokes Section 4-102 of the Act. That section protects public entities from liability for any "failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102. But the Plaintiffs do not allege that the Board was

providing or was supposed to provide a police-protection service, so the Board's argument fails.

For one, the Board misrelies on an overruled case in arguing that it is absolutely immunized for failing to prevent a sexual assault. *See* Bd. Reply Br. at 8. That case is *A.R. ex rel. M.R. v. Chi. Bd. of Educ.*, 724 N.E.2d 6, 9-11 (Ill. App. Ct. 1999), which interpreted Section 4-102 to provide the Board immunity from allegations that its bus attendant failed to prevent the sexual assault of a student committed by another student. *See* Bd. Reply Br. at 8. But what is missing from the Board's argument is that the Illinois Supreme Court later held (in another case) that furnishing a bus attendant does not qualify as providing a police-protection service, and "to the extent that result … is inconsistent with the holding in *A.R.* … that case is overruled." *Doe ex rel. Ortega-Piron v. Chi. Bd. of Educ.*, 820 N.E.2d 418, 423 (Ill. 2004). Specifically, the Illinois Supreme Court held that *A.R.* did not apply the condition that police-protection services must be provided for that aspect of immunity to apply; under the plain language of Section 4-102, "immunity for failure to prevent a crime attaches *if police protection serviced is provided*." *Id.* at 421 (cleaned up) (emphasis in original).

Here, the Plaintiffs are correct that the negligence and willfulness claims are not related to police-protection services. It is not as if the Plaintiffs are trying to hold the Board liable for Reynolds' alleged failure to intervene; he is named only in a § 1983 claim as an individual defendant (and there is no *respondeat superior* liability for § 1983 claims). In any event, even an allegation like that—concerning a classroom

assistant—could not be characterized as providing, or failing to provide, "police protection services" under *Doe ex rel. Ortega-Piron*, 820 N.E.2d at 423. Instead, the Plaintiffs allege that the Board proximately caused James Doe's injuries because it failed to "reasonably direct, instruct, supervise, monitor, and train its employees on student safety on abuse." *See id.*; Am. Compl. ¶¶ 106-15. There are no facts to suggest that the Board is going to be faulted for any conduct analogous to "a police officer or someone standing in the place of a police officer to enforce the law," *Doe ex rel. Ortega-Piron*, 820 N.E.2d at 421-22, nor any allegations that the Board "provided services performed by police personnel, such as weapons detection, traffic control, and crowd security and control[,]" *Reyes*, 139 N.E.3d at 139. Because the alleged misconduct did not involve police-protection services under Section 4-102, the Board's argument on this point is rejected.

### c. Section 3-108

The final immunity question is whether the Board is shielded by Section 3-108, which immunizes public entities against injuries proximately caused by the negligent "supervision" of any "activity" on public property. 745 ILCS 10/3-108(a)-(b). Unlike the other sections of the Tort Immunity Act discussed above, Section 3-108 does not protect against liability for willful and wanton misconduct. *See Doe ex rel. Ortega-Piron*, 820 N.E.2d at 423. But on negligence claims, courts have interpreted Section 3-108 broadly to cover claims for failure to provide supervision and failure to adequately supervise employees on school property. *See, e.g.*, *id.* at 423-24 (holding that Section 3-108 applied where plaintiff alleged that the Board's failure to provide

supervision—by way of a bus attendant—proximately caused plaintiff to be sexually assaulted); *Doe I v. Bd. of Educ. of City of Chi.*, 364 F. Supp. 3d at 866 (holding that Section 3-108 immunizes Board from claims for negligent failure to control and to supervise school employee).

In light of the breadth of Section 3-108, the Board is immunized against the Plaintiffs' negligence claim for failure to supervise, monitor, direct, and instruct its employees. But the negligence claim survives based on conduct outside of those supervisory duties, such as failure to report the abuse, and failure to conduct background checks. Those non-supervisory duties are "unaffected by Section 3-108 and may proceed as alleged." *See Doe I v. Bd. of Educ. of City of Chi.*, 364 F. Supp. 3d at 866; Am. Compl. ¶ 107. *See also Hill v. Galesburg Cmty. Unit Sch. Dist. 205*, 805 N.E.2d 299, 304 (Ill. App. Ct. 2004) ("Supervision includes direction, teaching, demonstration of techniques, and-to-some-degree-active participation." (cleaned up)); *id.* at 305 (holding that Section 3-108 provides immunity from liability for injuries sustained during chemistry class supervised by teacher). So Section 3-108 narrows the negligence claim against the Board, but does not eliminate it altogether.

### d. Willful and Wanton—Knowledge Requirement

Moving on to the merits of the willfulness claim, the Board argues that the Amended Complaint does not sufficiently allege willful and wanton conduct. As background, there "is no separate and independent tort of willful and wanton conduct. … It is regarded as an aggravated form of negligence." *Krywin v. Chicago Transit Auth.*, 938 N.E.2d 440, 452 (Ill. 2010). So to "recover damages based upon a

defendant's alleged negligence involving willful and wanton conduct," a plaintiff must still allege, and later prove, that the "defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injury." *Id.* The difference, however, is that the plaintiff must also "allege either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff." *Doe ex rel. Ortega-Piron*, 820 N.E.2d at 423.

Here, in arguing that the Plaintiffs failed to state a claim for willful and wanton conduct, the Board relies on the same arguments it made on the Title IX claim—namely, that the Plaintiffs have not alleged that anyone with "authority to institute corrective measures" had actual knowledge of, and was deliberately indifferent to, the harassment. *See* Bd.'s Br. at 14-15. Unlike Title IX, however, liability for willful and wanton misconduct under Illinois common law does *not* require actual notice or knowledge.

The Board cites to only one authority—and only did so in the reply brief—for the proposition that "Illinois courts define willful and wanton conduct … as the failure to take precautions after knowledge of impending danger." Bd. Reply Br. at 9 (citing *Doe v. Bridgeforth*, 102 N.E.3d 710, 722 (Ill. App. Ct. 2018)). But the ellipses hide a lot: the omitted words are "*in part.*" *Bridgeforth*, 102 N.E.3d at 722 (emphasis added). The full definition is that a willful and wanton injury "must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as failure, after knowledge of impending danger, to exercise ordinary care to prevent it or *a failure to discover the danger*

*through recklessness, or carelessness when it could have been discovered by ordinary care.*" *O'Brien v. Twp. High Sch. Dist. 214*, 415 N.E.2d 1015, 1018 (Ill. 1980) (cleaned up) (emphasis added). In other words, "willful and wanton conduct differs from mere negligence in that it requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Barr v. Cunningham*, 89 N.E.3d 315, 319 (Ill. 2017) (cleaned up). If there is no evidence of prior injuries to put the defendant on notice, then Illinois courts have required "some evidence that the activity is generally associated with a risk of serious injuries." *Id.* at 320. The bottom-line is that, unlike the Title IX standard, plaintiffs can state a claim for willful and wanton conduct based only on the defendant's knowledge of the *risk* of misconduct. *See St. Francis Sch. Dist.*, 694 F.3d at 871.

It is true here that no facts in the Amended Complaint suggest that the Board *knew* of prior sexual misconduct by Velarde or even by other Special Education Classroom Assistants. But outright knowledge is not required; recklessness is enough. And on that form of willful and wanton conduct, the Plaintiffs have provided enough notice of the claim.

For one, the Plaintiffs allege that the Board acted with utter indifference to or in conscious disregard for the safety of others when it failed to (1) prevent and report the improper touching; (2) "reasonably direct, instruct, supervise, monitor, and train its agents … to ensure timely and proper reporting of sexual abuse"; (3) "be aware of the care and treatment needed for each student"; and (4) "adequately conduct

reference checks, background checks, or employment screenings of agents … ." *See* Am. Compl. ¶¶ 113-14. This is more than enough information to notify the Board of the specific conduct the Plaintiffs are alleging was willful and wanton.

The Plaintiffs also allege that the Board breached its duties to James Doe despite having notice of a substantial danger of harm. Am. Compl. ¶¶ 110-12. Although this is too conclusory on its own, there are other allegations in the Amended Complaint from which to infer the Board's "knowledge of facts which would disclose [the] danger [of sexual abuse] to any reasonable man." *See Barr*, 89 N.E.3d at 319. For example, the Plaintiffs allege that the Board "deliberately disregarded" its own requirements to conduct background checks and allowed persons who did not undergo screening "to have exposure to children." Am. Compl. ¶ 36. In addition, the Plaintiffs allege that an August 2018 report on "Preventing and Responding to Sexual Misconduct against Student[s] in Chicago Public Schools" found "systematic deficiencies in CPS' efforts to prevent and respond to incidents of sexual misconduct occurring at all levels of the schools, the networks, the Central Office, and the Board, and that, while there were policies and procedures about sexual misconduct on the books, employees were not consistently trained on them, and there were no mechanisms to ensure that they were being uniformly implemented or to evaluate their effectiveness." *Id.* ¶¶ 41-42. Although the report was released after Velarde's alleged harassment of James Doe, together with the Plaintiffs' other allegations, it does support a plausible inference that the Board knew that its employees were not consistently trained on sexual misconduct policies, knew these policies were not

uniformly implemented, and knew that it was not conducting background checks on all employees. Viewing the Amended Complaint in the light most favorable to the Plaintiffs, these facts could plausibly alert any reasonable person that there was a serious danger to student safety.

It is true that, later at the summary judgment stage, the Plaintiffs will have to turn these allegations into evidence-supported facts. But at this point, because the Plaintiffs have adequately pled willful and wanton conduct, the Board's motion to dismiss Count 8 is denied.

## 2. Battery (Count 9)

The Plaintiffs also bring a claim for battery against Velarde, as well as against the Board under a theory of vicarious liability. Am. Compl. ¶¶ 116-19. "To allege battery, [a] plaintiff must allege that the defendant intended to cause a harmful or offensive contact and that a harmful or offensive contact resulted." *Happel v. Wal-Mart Stores, Inc.*, 737 N.E.2d 650, 657 (Ill. App. Ct. 2000). An employer may be liable for a battery committed by one of its employees "only when the employee's acts were committed within the scope of his employment." *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 966 N.E.2d 52, 60 (Ill. App. Ct. 2012). As explained next, Velarde's motion to dismiss the battery claim is denied, but the Board's motion is granted.

### a. Velarde

Velarde correctly points out that, under Illinois law, "'there exists a dichotomy within the intent requirement for the tort of battery, *i.e.*, whether intent equates to an intent to harm or offend, or merely an intent to touch.'" Velarde Br. at 8-9 (quoting

*Bakes v. St. Alexius Med. Ctr.*, 955 N.E.2d 78, 85 (Ill. App. Ct. 2011)). *Compare Bakes*, 955 N.E.2d at 85, *with Boyd v. City of Chicago*, 880 N.E.2d 1033, 1043-44 (Ill. App. Ct. 2007) ("The tort of battery is defined as the unauthorized touching of another's person."), *and Kling v. Landry*, 686 N.E.2d 33, 41 (Ill. App. Ct. 1997) ("An action for battery does not depend on the hostile intent of the defendant, but on the absence of the plaintiff's consent to the contact."). Either way, even on the more onerous standard (intent to harm), the Plaintiffs have readily alleged enough.

The Plaintiffs allege that Velarde touched James Doe "without consent" and that the touching "was of an insulting or provoking nature," Am. Compl. ¶¶ 117-18, which satisfies the requirement that the touching be "unauthorized" or "offensive." Also, the fact that this occurred on at least two occasions—and that on at least one of these occasions, Velarde touched James Doe's penis "multiple times," *id.* ¶ 22— satisfies the more demanding "intent to harm or offend" standard. In other words, the Plaintiffs have plausibly alleged that repeatedly touching a student's penis without their consent could neither be an accident nor a well-intentioned act. *See Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 940 (N.D. Ill. 2011) (holding that plaintiff stated a claim for battery where the defendant touched him "in a sexual manner without his consent on various occasions[,]" and the conduct "was offensive to a reasonable person and … undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights and emotional well-being."). So the battery claim survives against Velarde.

### b. The Board

In contrast, the battery claim against the Board fails as a matter of law, because foisting *respondeat superior* liability on the Board requires that Velarde acted within the scope of employment. On that requirement, the Plaintiffs maintain that Velarde's conduct was within the scope of his employment because he was carrying out his duties as a Special Education Classroom Assistant at the time. Pls.' Resp. Br. at 11. But that argument does not hold up under the Illinois definition of "scope of employment."

Specifically, Illinois courts have explained that "[w]here an employee's deviation from the course of employment is slight and not unusual, a court may find … that the employee was still executing the employer's business. Conversely, when a deviation is exceedingly marked and unusual, as a matter of law the employee may be found to be outside the scope of employment." *Stern v. Ritz Carlton Chi.*, 702 N.E.2d 194, 196 (Ill. App. Ct. 1998) (cleaned up). Moreover, where an employee commits an intentional tort "purely in his own interest" vicarious liability does not apply. *Randi F. v. High Ridge YMCA*, 524 N.E.2d 966, 970 (Ill. App. Ct. 1988); *see also Stern*, 702 N.E.2d at 198 (holding that hotel-employer was not vicariously liable for employees' actions because the "sexual assault of plaintiffs during the course of each massage could in no way be interpreted as an act in furtherance of the [employer's] business interests … ."). In *Randi*, the Illinois Appellate Court held that the sexual molestation of a child by a teacher's aide was not within the scope of the aide's employment, even though her duties included "the care, custody, control,

supervision and discipline" of children. 524 N.E.2d at 963, 968. Same here: even though Velarde's alleged misconduct occurred while he acting as James Doe's Classroom Assistant, his actions could not have been in furtherance of the Board's interests. The alleged sexual misconduct is too far afield from Velarde's duties to be considered within the scope of employment. This claim against the Board must be dismissed with prejudice.

## IV. Conclusion

For the reasons explained in this Opinion, the Court decides as follows.

With regard to the Board,

- the Title IX claim (Count 1) is dismissed without prejudice;
- the Rehabilitation Act and ADA claims (Counts 2 and 3) are dismissed without prejudice;
- the negligence claim (Count 7) is dismissed with prejudice in part as to failure to supervise, monitor, direct, and instruct, but otherwise survives;
- the willful and wanton conduct claim (Count 8) survives; and
- the battery claim (Count 9) is dismissed with prejudice.

With regard to Velarde,

- the equal-protection claim (Count 4) survives;
- the Fourth Amendment claim (Count 5) is dismissed without prejudice;
- the substantive due process claim (Count 6) survives; and
- the battery claim (Count 9) survives.

With regard to Reynolds, the sole claim against him, for failure to intervene (Count 10), survives.

For the dismissals that are without prejudice, the Plaintiffs may file a second amended complaint to fix the deficiencies (if possible) identified in this Opinion by

April 27, 2020. The status hearing set for April 30, 2020, at 9:15 a.m. remains in place.

ENTERED:


_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 24, 2020